# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

EDMUND AWAH,

    Plaintiff,

v.

HOLY CROSS HOSPITAL OF
SILVER SPRING, INC.,

    Defendant.

Civil Action No. TDC-22-0195

## MEMORANDUM OPINION

Plaintiff Edmund Awah has filed a civil action alleging violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd (2018), in connection with his visit to the emergency room at Holy Cross Hospital in Germantown, Maryland ("Holy Cross Hospital") on June 21, 2021. Holy Cross Health, Inc., d/b/a Holy Cross Germantown Hospital ("Holy Cross"), which the parties now agree is the proper defendant in this case, has filed a Motion to Dismiss, which Awah opposes. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Holy Cross's Motion to Dismiss will be GRANTED.

## BACKGROUND

Awah asserts the following facts in the Complaint, which the Court accepts as true for purposes of the Motion. On June 21, 2021, while taking a walk around his neighborhood in Gaithersburg, Maryland, Awah sustained a bite on his thigh from a large Cane Corso dog. Montgomery County Animal Control was called to the scene of the incident and documented the

dog bite. Awah returned home, began to have a panic attack, and then called for an ambulance, which brought him to Holy Cross Hospital.

In the ambulance, paramedics took Awah's blood pressure. When Awah arrived in the emergency room ("ER"), he was asked to wait in the lobby. A staff member asked Awah if he had health insurance or the means to pay for the visit, to which he responded that he did not. According to Awah, after this conversation, ER staff did not follow "standard critical screening protocols" that "any hospital follows," including measuring the patient's blood pressure, heart rate, body temperature, height, and weight, evaluating the patient's heart function, and conducting an in-depth interview of the patient. Am. Compl. ¶ 11, ECF No. 19. He also alleges that the ER staff did not complete "[s]tandard screening and treatment protocols on dog bites," including providing a tetanus shot and a rabies vaccine. *Id.* ¶ 12. Instead, they failed to respond to his complaints about his panic attacks and his requests for pain killers.

After waiting 30 minutes in the ER lobby, Awah was asked to lie down on a bed in the ER. After another 30 minutes, Awah was visited by an "emergency room technician" who confirmed that Awah lacked health insurance and "took a cursory look" at the dog bite wound, then left. *Id.* ¶ 16. After another half hour passed, the same emergency room technician gave Awah a prescription for medications to treat the dog bite. Although Awah continued to complain of the pain from his wound and of his panic attacks, Awah was discharged from Holy Cross Hospital. Awah asserts that he was discharged without having been screened, evaluated, or stabilized in relation to his pain and panic attacks.

In the presently operative Amended Complaint, Awah alleges that Holy Cross violated EMTALA based on the purported failure to screen him for an emergency medical condition and to stabilize him prior to discharge. He seeks compensatory and punitive damages.

## DISCUSSION

In its Motion to Dismiss, Holy Cross seeks dismissal of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Awah has failed to state a plausible claim for relief under EMTALA.

### I. Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* A court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). A self-represented party's complaint must be construed liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, "liberal construction does not mean overlooking the pleading requirements under the Federal Rules of Civil Procedure." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020).

### II. EMTALA

In 1986, Congress enacted EMTALA "in response to a growing concern that hospitals were 'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Brooks v. Md. Gen. Hosp.*, 996 F.2d 708, 710 (4th Cir. 1993). As a "limited anti-dumping statute," EMTALA is not a federal medical malpractice statute and was not intended to supplant state malpractice law with a

3

single federal cause of action. *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996).

EMTALA imposes two primary requirements on hospitals. First, "if any individual comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). An emergency medical condition is defined as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in–
> (i) placing the health of the individual . . . in serious jeopardy,
> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part[.]

*Id.* § 1395dd(e)(1).

EMTALA's screening requirement does not establish a "national standard of care"; rather, "EMTALA only requires hospitals to apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 878 (4th Cir. 1992). Thus, an EMTALA failure-to-screen claim requires the plaintiff to "invoke[] the language of disparate treatment" which is "the linchpin of an EMTALA claim." *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir. 1996). The "adequacy of the screening examination" is not at issue; courts must instead focus on "whether the screening examination that was performed deviated from the hospital's evaluation procedures that would have been performed on any patient in a similar condition." *Baber*, 977 F.2d at 881.

Second, if upon such screening "the hospital determines that the individual has an emergency medical condition, the hospital must provide either . . . within the staff and facilities

available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition," or "for transfer of the individual to another medical facility." 42 U.S.C. § 1395dd(b)(1). The term "to stabilize" is defined as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" *Id.* § 1395dd(e).

As with a failure-to-screen claim, the inquiry on a failure-to-stabilize claim is limited. Hospitals are obligated only to stabilize "conditions that they actually detect," as EMTALA "does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers*, 78 F.3d at 145. Further, the obligation to stabilize applies only to detected emergency medical conditions: "EMTALA's stabilization requirement is focused upon the patient's emergency medical condition, not her general medical condition." *Bryan*, 95 F.3d at 352. This requirement is satisfied if the hospital provides treatment necessary "to prevent the material deterioration of a patient's condition." *Matter of Baby K*, 16 F.3d 590, 595 (4th Cir. 1994); *see* 42 U.S.C. § 1395dd(e)(3)(A). Any other claim for inadequate care is "regulated by the tort law of the several states." *Bryan*, 95 F.3d at 351.

An individual may bring a private civil action for damages for a violation of EMTALA. Specifically, "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of [EMTALA] may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located." *Id.* § 1395dd(d)(2)(A).

Fairly construed, the Complaint alleges that Holy Cross violated EMTALA by (1) failing to screen Awah in accordance with its standard screening procedures; and (2) failing to stabilize his condition prior to discharging him from the ER.

## III. Failure to Screen

In the Complaint, Awah asserts that at the ER, he reported the dog bite to his leg, stated that he was in pain and requested pain killers, and complained of panic attacks. He further states, however, that an ER staff member briefly examined the dog bite wound and then provided him with a prescription for medication to treat the wound. Thus, in the Complaint, Awah has acknowledged that he was screened in the ER. Although he asserts that "[s]tandard screening and treatment protocols" at hospitals require a more in-depth screening, including taking vital signs, providing a tetanus shot, and providing a rabies vaccine, Am. Compl. ¶¶ 11-12, the failure to provide such treatment would be a matter of a medical malpractice claim, which Awah has confirmed is not asserted in the Complaint.

As discussed above, a failure-to-screen claim turns on whether there was a disparity between the screening provided to the plaintiff as compared to the screening provided to similarly situated patients within the same ER. In *Vickers*, a patient who had fallen down and received lacerations to his scalp was examined in an ER, and his scalp was repaired with staple sutures, but he later died of undetected conditions related to a fracture of the skull. 78 F.3d at 141. The court held that EMTALA was not violated because it does not require that patients be screened in accordance with the most severe potential outcome of the condition at issue; rather, it requires only that the screening conform with how other patients with similar perceived conditions are treated. *Id.* at 143-45; *see Baber*, 977 F.2d at 882. Here, although Awah generally claims that a patient with health insurance would have received the additional screening he described, he has offered

6

no facts demonstrating that Holy Cross's screening procedure for an individual with a dog bite of the type suffered by Awah includes the additional steps that he asserts were necessary. Particularly where Awah has not provided any basis to conclude that the visual screening was insufficient in his particular case, such as a claim that he contracted an infection or rabies due to a lack of treatment, the Court will not infer from the allegations in the Complaint that Holy Cross deviated from its standard screening procedure for this type of injury.

Further, even if Awah could be deemed to have plausibly alleged disparate treatment, he has failed to allege sufficient facts demonstrating that he was harmed as a "direct result" of the disparate screening procedure, as required to advance a private civil action under EMTALA. 42 U.S.C. § 1395dd(d)(2)(A). Awah has not alleged facts demonstrating that because of the failure to provide the additional screening, he contracted an infection, rabies, or some other medical condition. Although Awah generally alleges that since his ER visit, he has endured pain and suffering, panic attacks, mental anguish and emotional distress, and disfigurement and associated humiliation, he has not provided allegations that would demonstrate that any of these results were caused by the allegedly disparate screening. For example, he has not alleged facts supporting the conclusion that had Holy Cross taken his vital signs, interviewed him, or given him tetanus or rabies shots, that any disfigurement from the dog bite would have been avoided. Nor has he plausibly alleged that such procedures would have provided information, beyond what was available from the visual examination of the wound and Awah's verbal complaints, that would have resulted in a reduction in his pain or panic attacks. Without a basis to conclude that the failure to screen caused a specific harm to Awah, the claim cannot succeed. *See* 42 U.S.C. § 1395dd(d)(2)(A). To the extent that Awah argues that he should have received additional medication or other treatment to address pain or panic attacks, his claim is one of medical

7

malpractice, not an EMTALA violation. *See Vickers*, 78 F.3d at 143 (highlighting "the distinction between the initial screening examination, the focus of EMTALA, and the correctness of the treatment that follows from the screening").

## IV.  Failure to Stabilize

As for the failure-to-stabilize claim, Awah has not alleged facts supporting the conclusion that the dog bite and panic attacks constituted an "emergency medical condition" that required stabilization, or that any additional stabilization was required before Awah was discharged. 42 U.S.C. § 1395dd(e)(1). Although Awah has generally alleged "severe pain," which can be an indicator of an emergency medical condition, he has failed to allege facts that could support the conclusion that the pain and panic attacks resulting from the dog bite, in the absence of immediate, additional medical attention, could reasonably have been expected to result in placing his health "in serious jeopardy" or causing "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." *Id.*

Further, the allegations in the Complaint do not support the conclusion that Awah's condition was not stabilized prior to discharge. EMTALA does not require hospitals to keep patients pain-free or even to ensure that patients are comfortable after discharge. Rather, EMTALA's stabilization requirement mandates only that hospitals "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A). Awah's claim that he was "still suffering" from symptoms of panic attacks and continued to feel severe pain after discharge does not demonstrate that there was a deterioration of his condition after discharge. Am. Compl. ¶ 18.

Where the hospital did screen and treat the patient such that no material deterioration occurred upon discharge, Awah has not stated a plausible EMTALA claim.

Awah's claim is similar to that asserted in *Gerber v. Northwest Hospital Center*, 943 F. Supp. 571 (D. Md. 1996), in which a patient visiting the ER had certain gastrointestinal symptoms which, she told the emergency room staff, were causing her to experience suicidal ideations. *Id.* at 574. An ER doctor screened and treated the patient's physical symptoms but did not address her psychiatric symptoms before she was discharged, and two days later the patient attempted suicide. *Id.* The court found that the failure to address Gerber's psychiatric condition and the subsequent suicide attempt did not establish failure-to-screen or failure-to-stabilize claims under EMTALA where the physician screened the patient, identified a possible emergency medical condition, and stabilized that condition prior to discharge. *Id.* at 576-77. Any failure to detect or stabilize the psychiatric symptoms was a matter for a state law malpractice claim. *Id.* at 576. Here, where Awah appeared in the emergency room with a dog bite that he claimed was also causing panic attacks, he was screened and received a prescription for medication to treat the dog bite, and there have been no allegations demonstrating that Awah's condition constituted an emergency medical condition and that it deteriorated after discharge, the Court finds that Awah has failed to state a plausible EMTALA claim.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be GRANTED. A separate Order shall issue.

Date: December 12, 2022

THEODORE D. CHUANG
United States District Judge

9